# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| YODLE, INC.,<br>50 W. 23rd Street, 4th Floor<br>New York, NY | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| v. | : | No. |
| | : | |
| RONALD POUSSON,<br>620 Martin Drive<br>Avondale, PA, | : | JURY TRIAL DEMANDED |
| | : | |
| LOCAL INTERNET DOCTORS, INC.,<br>3 Linden Circle<br>Lincoln University, PA, | : | |
| | : | |
| FRANK NORRIS,<br>3 Linden Circle<br>Lincoln University, PA, | : | |
| | : | |
| DANIEL MOUSETIS,<br>4408 Sansom Street<br>Apt. 1<br>Philadelphia, PA, and | : | |
| | : | |
| CHRISTOPHER ESGRO,<br>310 Yardley Commons<br>Yardley, PA, | : | |
| | : | |
| Defendants. | : | |

## VERIFIED COMPLAINT

Plaintiff Yodle, Inc. ("Yodle") brings this action to put an end to the unlawful scheme

formulated by three of its former employees to steal, use and disclose Yodle's confidential

and proprietary information and to prohibit Defendants from continuing to compete

unlawfully with Yodle and solicit Yodle employees and customers, all in violation of their

non-disclosure, non-solicitation and non-competition agreements.

Dockets.Justia.com

On December 11, 2009, Yodle learned that three of its former employees, Defendants Ronald Pousson ("Pousson"), Daniel Mousetis ("Mousetis") and Christopher Esgro ("Esgro") have been unlawfully hacking into Yodle's computer system and downloading confidential and proprietary information for at least the past six months. Pousson, Mousetis and Esgro have knowingly obtained this valuable information in order to allow Pousson and Defendant Frank Norris ("Norris") to establish Defendant Local Internet Doctors, Inc. ("LID"), a competing company that has conspired with the other Defendants to use Yodle's trade secrets to poach Yodle's customers and otherwise wage unlawful competition against it. The Defendants' unlawful scheme has and continues to injure Yodle and, as a result, Yodle seeks temporary, preliminary and permanent injunctive relief, as well as monetary damages, to remedy the Defendants' unlawful conduct.

## PARTIES

1.      Yodle is a Delaware corporation with its principal place of business located at 50 West 23rd Street, 4th Floor, New York, New York.

2.      Pousson is an individual who resides, upon information and belief, at 620 Martin Drive, Avondale, Pennsylvania. He is a former manager of Yodle who has been knowingly participating in the scheme to steal Yodle's confidential and proprietary information.

3.      LID is a Pennsylvania corporation with a principal place of business located at 3 Linden Circle, Lincoln University, Pennsylvania. Pousson established LID with his business partner, Norris. LID is a direct competitor of Yodle and has been knowingly participating in the scheme to steal Yodle's confidential and proprietary information.

4.     Norris is an individual who resides, upon information and belief, at 3 Linden Circle, Lincoln University, Pennsylvania. Norris is a co-founder of LID and has been knowingly participating in the scheme to steal Yodle's confidential and proprietary information.

5.     Mousetis is an individual who resides, upon information and belief, at 4408 Sansom Street, Apartment 1, Philadelphia, Pennsylvania. Mousetis is a former Yodle employee who has been knowingly participating in the scheme to steal Yodle's confidential and proprietary information.

6.     Esgro is an individual who resides, upon information and belief, at 310 Yardley Commons, Yardley, Pennsylvania. Esgro is a former Yodle employee who, upon information and belief, works for LID. Esgro has been knowingly participating in the scheme to steal Yodle's confidential and proprietary information.

**JURISDICTION AND VENUE**

7.     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the parties are completely diverse and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

8.     The Court also has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because it includes a cause of action arising under the Constitution, laws, or treaties of the United States of America. Specifically, Count VIII asserts a claim under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.* The Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.

9.     Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(1) and (2) because Pousson, Norris, Mousetis and Esgro reside and work in the Eastern District of Pennsylvania,

LID and Yodle conduct business in this District, and because a substantial part of the events giving rise to Yodle's claims occurred in this District.

## **FACTUAL BACKGROUND**

10.     Yodle is an industry leader in providing local online advertising services to businesses around the country. In general, Yodle provides its services in three steps. First, Yodle creates and publishes advertisements on behalf of its clients that will appear in relevant searches on major search engines like Yahoo! and Google. Second, Yodle drives leads to clients' websites (and assists clients in building custom websites called "adverSites"). Third, Yodle tracks its clients' leads and helps them optimize their advertising efforts via Yodle's proprietary lead management and call tracking tools. Based in New York, NY, Yodle also has offices in Philadelphia, PA; Charlotte, NC; Boston, MA; and Scottsdale, AZ.

11.     Yodle's employees are provided with varying levels of direct access to Yodle's electronic database, known as "Yodle Live," depending upon their level of responsibility. Yodle Live includes, among other items, confidential information concerning customers and prospective customers; customer performance data; churn data; customer contact information; client status (e.g., active or inactive); and sales information. By accessing Yodle Live, an individual can obtain the contact information of every potential customer to whom Yodle has issued a contract for at least the past thirty days (and likely longer), and can access a host of other competitively sensitive information relating to actual and potential customers. Yodle Live, along with Yodle's other computer and database systems, are used by Yodle to provide demonstrations to prospects and to conduct business in

interstate commerce, including but not limited with its clients across the country and among its various business locations.

12.     Such confidential information is proprietary to Yodle, and not readily available to the public. All of this confidential information was developed for, or by, Yodle, for Yodle's exclusive use, often through years of strategic development and refinement. Yodle takes steps to protect its confidential and proprietary business information.

### The Defendants' Unlawful Conduct

13.     Pousson began working for Yodle in December of 2007. As a City Manager, Pousson was responsible for managing and overseeing Yodle's workforce assigned to its Philadelphia location.

14.     In connection with his employment, Pousson entered into Yodle's standard Invention, Non-Disclosure, Non-Competition and Non-Solicitation Agreement (the "Noncompete"). A copy of Pousson's noncompete is attached hereto as Exhibit A.

15.     The Noncompete is designed to protect Yodle's trade secrets, its confidential and proprietary business interests and its goodwill.

16.     The Noncompete contains a perpetual commitment barring Pousson from disclosing confidential Yodle information, including information regarding Yodle's customers:

> *[Pousson] agrees that all information and know-how, whether or not in writing, of a private, secret or confidential nature concerning the Company's business or financial affairs (collectively, "Proprietary Information") is and shall be the exclusive property of the Company. By way of illustration, but not limitation, Proprietary Information may include discoveries, inventions, products, product improvements, product enhancements, processes, methods, developments, plans (including business and marketing plans), research data, clinical data, financial data (including sales costs, profits, pricing methods), personnel data, computer programs (including software used pursuant*

*to a license agreement), customer, prospect and supplier lists, and contacts at or knowledge of customers or prospective customers of the Company. [Pousson] will not disclose any Proprietary Information to any person or entity other than employees of the Company or use the same for any purposes (other than in the performance of his duties as an employee of the Company) without written approval by an officer of the Company, either during or after his employment with the Company, unless and until such Proprietary Information has been disclosed publicly by the Company.*

17.   The Noncompete also precludes Pousson from competing with Yodle, or from soliciting Yodle's customers or employees, for a period of one (1) year following the conclusion of his employment. His Noncompete states, in pertinent part,

*(a)    While [Pousson] is employed by the Company and for a period of twelve months after the termination or cessation of such employment for any reason, [Pousson] will not directly or indirectly:*

*(i)    engage or assist others in engaging in any business or enterprise... that develops, manufactures, markets, licenses, sells or provides any product or service that competes with any product or service developed, manufactured, marketed, licensed, sold or provided, or planned to be developed, manufactured, marketed, licensed, sold or provided, by the Company while [Pousson] was employed by the Company; or*

*(ii)    either alone or in association with others, divert or take away, or attempt to divert or take away, the business or patronage of any of the clients, customers, or business partners of the Company.*

*(iii)    either alone or in association with others solicit, induce, or attempt to induce, any employee or independent contractor of the Company to terminate his or her employment or other engagement with the Company, or to hire or engage any such employee or independent contractor.*

*(b)    If [Pousson] violates the provisions of any of the preceding paragraphs of this paragraph 4, the duration of the restrictions set forth in such paragraph shall be extended by the duration [Pousson's] violation of such provisions.*

18.     During his tenure with Yodle, Pousson actively participated in senior level strategic planning meetings regarding sales strategy, and was responsible for Yodle's entire Philadelphia sales force, including the hiring and managing of both Mousetis and Esgro.

19.     In his capacity as a City Manager, Pousson was exposed to and entrusted with substantial Yodle confidential and proprietary information, including, but not limited to, customer satisfaction data, Yodle specific target segments and sales strategies, highest performing and most valuable segments, hiring profiles, current and potential customer information, financial goals, performance metrics, and Yodle's product pipeline.

20.     On June 5, 2009, Pousson was terminated from Yodle.

21.     In connection with his termination, Pousson entered into a Separation Agreement in which he reaffirmed his obligations under the Noncompete in exchange for severance pay, among other benefits.

22.     Mousetis was also terminated from Yodle in June 2009. Esgro abandoned his job two months later. Like Pousson, both Mousetis and Esgro executed a Yodle Noncompete (with terms identical to those in Pousson's Noncompete) upon the inception of their employment with Yodle. A copy of Mousetis' noncompete is attached hereto as Exhibit B. A copy of Esgro's noncompete is attached hereto as Exhibit C.

23.     Following his termination from Yodle, Pousson began soliciting current Yodle employees to leave Yodle and to work with him instead. For example, in November 2009, Pousson contacted a current Yodle employee, Tarek Osman ("Osman"), through the online social networking site, Facebook. During this conversation, Pousson represented that he was working for a Yodle competitor, WebVisible, Inc. ("WebVisible"), and that Esgro had come to work for him. Pousson began inquiring about Yodle's financial situation and requested

that Osman leave his employment with Yodle and come to work with him and Esgro at WebVisible.

24.     During the week of December 7, 2009, Yodle learned from WebVisible's Chief Executive Officer, Kirsten Mangers, that WebVisible was intending to issue a "Cease and Desist" letter to Pousson, demanding that he cease engaging in misrepresentations relating to WebVisible. Yodle learned during this conversation that Pousson founded LID.

25.     Upon information and belief, and according to its own website, localinternetdoctors.com, LID provides the exact same services as Yodle – local online advertising services. LID is a competitor of Yodle.

26.     On December 11, 2009, Yodle was informed by one of its competitors, Lance Bachmann, President of localinternettraffic.com, that Pousson had reportedly been accessing Yodle Live unlawfully, by using the username and password of a former Yodle employee, to gain access to and download as much of Yodle's confidential and proprietary information as he could, including competitively sensitive information relating to Yodle's current and prospective customers. Yodle also learned that Pousson had sent a text message to Mr. Bachmann that included information relating to a potential Yodle customer: the customer's name, contact information, its monthly budget, and the terms of its pending contract with Yodle. Such information is not only confidential and proprietary, but severely damaging to Yodle in the hands of a competitor.

27.     Upon learning this information, Yodle conducted a forensic analysis of its computer servers and discovered that Pousson has indeed been unlawfully accessing the server and downloading Yodle's confidential and proprietary information through accounts registered to Mousetis and Esgro, dan@yodle.com and chrise@yodle.com. Yodle's

preliminary investigation has revealed that the IP address which has used these accounts to access Yodle Live is registered in Philadelphia.

28.     Upon information and belief, Mousetis and Esgro have knowingly provided Pousson with their usernames and passwords so that Pousson can unlawfully access Yodle's system and utilize this information to wage unfair competition against it through his company, LID. Pousson has unlawfully accessed no less than thirty-one (31) different customer accounts since his termination from Yodle, most recently on Thursday, December 10, 2009.

29.     Upon learning of this unauthorized access, Yodle immediately took necessary steps to prevent any future unlawful access, including disabling the dan@yodle.com and chrise@yodle.com accounts.

30.     Upon information and belief, the Defendants have knowingly been using Yodle's confidential and proprietary information to solicit and profit from Yodle's customers and have disclosed this information to other Yodle competitors in an effort to sabotage Yodle's business.

31.     Following Yodle's recent discovery of the Defendants' actions, the Defendants have attempted to conceal their unlawful behavior by removing most references to Pousson's name from LID's website. The Defendants, however, have not been successful in covering all of their tracks. As of December 13, 2009, the "About Us" page of LID's website proudly represents that the company was "co-founded by Frank Norris and Ron Pousson to serve the internet needs of businesses in Southeastern Pennsylvania, Delaware, and Maryland."

32.     The unlawful downloading, use and retention of Yodle's confidential and proprietary information continues to cause irreparable injury to Yodle. This information, in the hands of a competitor, will also cause extensive economic and business injury to Yodle.

## COUNT I
### (Conversion – All Defendants)

33.     Yodle repeats and incorporates by reference the allegations contained in paragraphs 1 through 32 as if fully stated herein.

34.     Defendants have intentionally exercised dominion and control over Yodle's property, including its confidential and proprietary customer information, so as to interfere with Yodle's right to control that property.

35.     Defendants' actions are intentional, willful, outrageous and malicious, and justify the imposition of punitive damages.

## COUNT II
### (Tortious Interference with Advantageous Business Relations – All Defendants)

36.     Yodle repeats and incorporates by reference the allegations contained in paragraphs 1 through 35 as if fully stated herein.

37.     Through the improper use of Yodle's confidential information, Defendants became aware of certain of Yodle's advantageous business relations with its clients and prospective clients.

38.     Upon information and belief, Defendants undertook conduct designed to induce certain Yodle clients and prospective clients to sever, curtail or refrain from entering into advantageous business relations with Yodle.

39.     Defendants' conduct as described herein has damaged Yodle in an amount to be proven at trial.

40.     Defendants' conduct as described herein is willful and malicious and entitles Yodle to recover punitive damages.

## COUNT III
### (Tortious Interference with Contractual Relations - All Defendants)

41.     Yodle repeats and incorporates by reference the allegations contained in Paragraphs 1 through 40 as if fully stated herein.

42.     Pousson, Mousetis and Esgro are subject to contractual obligations to refrain from working for a Yodle competitor, to refrain from soliciting other Yodle employees and to refrain from using Yodle's confidential information.

43.     Each of the Defendants are aware of these contractual obligations.

44.     Despite this knowledge, Defendants intentionally induced, without justification, Pousson, Mousetis and Esgro to breach their contractual obligations to Yodle by working for Yodle competitors, soliciting Yodle employees and misappropriating Yodle's confidential information.

45.     Defendants' conduct as described herein has damaged Yodle in an amount to be proven at trial.

46.     Defendants' conduct as described herein is willful and malicious and entitles Yodle to recover punitive damages.

## COUNT IV
### (Breach of Duty of Loyalty – Pousson, Mousetis and Esgro)

47.     Yodle repeats and incorporates by reference the allegations contained in paragraphs 1 through 46 as if fully stated herein.

48.     Pousson, Mousetis and Esgro occupied positions of trust and confidence in connection with their employment by Yodle.

49.     Employees, such as Pousson, Mousetis and Esgro, who occupy a position of trust and confidence, owe a duty of loyalty to their employer and must protect the interests of the employer.

50.     Pousson, Mousetis and Esgro breached the duty of loyalty they owed to Yodle and failed to protect Yodle's interests by, among other things, unlawfully obtaining, using, and disclosing Yodle's confidential and proprietary information.

51.     Pousson, Mousetis and Esgro's actions have caused and continue to cause damage and irreparable harm to Yodle.

52.     Pousson, Mousetis and Esgro's actions were intentional, willful, outrageous, and malicious and justify the imposition of punitive damages.

## COUNT V
### (Misappropriation of Trade Secrets – All Defendants)

53.     Yodle repeats and incorporates by reference the allegations contained in paragraphs 1 through 52 as if fully stated herein.

54.     Defendants have engaged in the actual or threatened misappropriation of Yodle's confidential information.

55.     By the conduct described above, Defendants are engaging in misappropriation in violation of the common law and the Pennsylvania Uniform Trade Secrets Act, 12 Pa. C.S. §§ 5301, *et seq.*

56.     Defendants' actions were intentional, willful, outrageous and malicious, and justify the imposition of punitive damages.

## COUNT VI
### (Breach of Contract – Pousson, Mousetis and Esgro)

57.     Yodle repeats and incorporates by reference the allegations contained in paragraphs 1 through 56 as if fully stated herein.

58.     Pousson, Mousetis and Esgro each entered into an Invention, Non-Disclosure, Non-Competition and Non-Solicitation Agreement, for consideration.  Pousson also entered into a Separation Agreement with Yodle, for consideration.

59.     Pousson breached his agreements by, among other things, establishing and working for a Yodle competitor, soliciting Yodle's employees and customers, and obtaining, possessing, disclosing, and using Yodle's confidential and proprietary information. Likewise, Mousetis and Esgro breached their agreements by providing unlawful access to Yodle's confidential and proprietary information and, in the case of Esgro, by working for a competitor.

60.     As a direct and proximate result of Pousson, Mousetis and Esgro's breaches, Yodle has suffered and continues to suffer damages in an amount to be proven at trial.

## COUNT VII
### (Breach of Implied Contract – Pousson, Mousetis and Esgro)

61.     Yodle repeats and incorporates by reference the allegations contained in paragraphs 1 through 60 as if fully stated herein.

62.     Pousson, Mousetis and Esgro, as employees of Yodle, had an implied contract with Yodle not to use confidential or proprietary business information of Yodle gained through their employment for the benefit of a competitor.

63.     Pousson, Mousetis and Esgro had access to the confidential and proprietary business information of Yodle during the course of their employment with Yodle.

64.     Pousson, Mousetis and Esgro breached their implied contracts with Yodle not to use the confidential and proprietary information of Yodle for the benefit of a competitor.

65.     As a direct and proximate result of Pousson, Mousetis and Esgro's breaches, Yodle has suffered damages and continues to suffer damages in an amount to be proven at trial.

## COUNT VIII
**(Computer Fraud and Abuse Act – 18 U.S.C. § 1030 *et. seq.* – Pousson, Mousetis and Esgro)**

66.     Yodle repeats and incorporates by reference the allegations contained in paragraphs 1 through 65 as if fully stated herein.

67.     Pousson, Mousetis and Esgro unlawfully accessed Yodle's protected computers without authorization.

68.     Pousson, Mousetis and Esgro did so knowingly and with the intent to defraud Yodle of its confidential and proprietary information.

69.     Pousson, Mousetis and Esgro furthered their intended fraud by unlawfully obtaining Yodle's valuable confidential and proprietary information, using it for their competitive business, and by disclosing it to other Yodle competitors.

70.     Pousson, Mousetis and Esgro's unlawful actions have damaged Yodle, including but not limited to the loss of valuable, confidential and proprietary information to competitors, the compromised integrity of Yodle's data and computer system, and the costs of responding to this offense, conducting a damage assessment, and restoring the system to its pre-compromised state.

## COUNT IX
### (Civil Conspiracy – All Defendants)

71.     Yodle repeats and incorporates by reference the allegations contained in paragraphs 1 through 70 as if fully stated herein.

72.     Defendants had an agreement to perform the unlawful acts set forth herein.

73.     The unlawful acts committed by Defendants have resulted in damages to Yodle.

74.     Each of the Defendants has committed at least one overt act in furtherance of the conspiracy.

75.     As a direct and proximate result of the breaches, Yodle has suffered and continues to suffer damages in an amount to be proven at trial for which each of the Defendants is jointly and severally liable.

## COUNT X
### (Replevin – All Defendants)

76.     Yodle repeats and incorporates by reference the allegations contained in paragraphs 1 through 75 as if fully stated herein.

77.     The confidential and proprietary information developed by Yodle is property of Yodle.

78.     Defendants' acquisition of, retention of, and use of this property without Yodle's authorization is unlawful.

79.     Yodle is entitled to immediate possession of this information or, in the alternative, for the immediate destruction of all such information in the possession of Defendants.

80.     Yodle has suffered damages as a result of Defendants' conduct.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Yodle hereby respectfully requests this Honorable Court to:

(i)  Enter judgment in favor of Yodle against each of the Defendants and award compensatory, punitive and multiple damages, as appropriate;

(ii)  Issue a temporary restraining order against Defendants and then, after hearing, a preliminary injunction followed by a permanent injunction barring them from continuing their unlawful acts;

(iii)  Award attorneys' fees and costs;

(iv)  Grant Yodle a jury trial on all issues so triable; and

(v)  Grant such other and further relief as this Court deems just and proper.

Respectfully submitted,

**YODLE, INC.**

By its attorneys,

William J. Leahy (PA #80340)
**LITTLER MENDELSON, P.C.**
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA 19102-1321
Tel: 267.402.3000
wleahy@littler.com

-and-

David C. Kurtz (*pro hac vice* admission pending)
Itia S. Roth (*pro hac vice* admission pending)
Joseph P. Calandrelli (*pro hac vice* admission pending)
**PRINCE LOBEL GLOVSKY & TYE LLP**
100 Cambridge Street
Suite 2200
Boston, Massachusetts 02114
Telephone: 617.456.8000
Fax: 617.456.8100
dkurtz@princelobel.com
iroth@princelobel.com
jcalandrelli@princelobel.com

Dated: December 15, 2009

## VERIFICATION

I, Court Cunningham, hereby certify as follows:

1.      I am the President and Chief Executive Officer of Yodle, Inc. ("Yodle").  As such, I am authorized to make this Verification on behalf of Yodle.

2.      I have read the attached Verified Complaint and, based on my personal knowledge and my knowledge of information reported to me by subordinates and colleagues who report to me, the factual allegations contained in the Verified Complaint are true.

3.      I certify under the pains and penalties of perjury under the laws of the United States of America that the foregoing statements made by me are true and correct.


_____
Court Cunningham

Dated:  December 15, 2009

# EXHIBIT A

## INVENTION, NON-DISCLOSURE, NON-COMPETITION
## AND NON-SOLICITATION AGREEMENT

This Agreement is made, effective as of ___4/18___,2008, between Yodle, Inc., Inc., a Delaware corporation (hereinafter referred to collectively with its subsidiaries as the "Company"), and ___Ron Pousson___ (the "Employee").

For good consideration and in consideration of the employment or continued employment of the Employee by the Company, and intending to be legally bound, the Employee and the Company agree as follows:

1.    Condition of Employment.

The Employee acknowledges that his employment and/or the continuance of that employment with the Company is contingent upon his agreement to sign and adhere to the provisions of this Agreement. The Employee further acknowledges that the nature of the Company's business is such that protection of its proprietary and confidential information is critical to the survival and success of the Company's business.

2.    Proprietary and Confidential Information.

(a)    The Employee agrees that all information and know-how, whether or not in writing, of a private, secret or confidential nature concerning the Company's business or financial affairs (collectively, "Proprietary Information") is and shall be the exclusive property of the Company. By way of illustration, but not limitation, Proprietary Information may include discoveries, inventions, products, product improvements, product enhancements, processes, methods, techniques, formulas, compositions, compounds, negotiation strategies and positions, projects, developments, plans (including business and marketing plans), research data, clinical data, financial data (including sales costs, profits, pricing methods), personnel data, computer programs (including software used pursuant to a license agreement), customer, prospect and supplier lists, and contacts at or knowledge of customers or prospective customers of the Company. The Employee will not disclose any Proprietary Information to any person or entity other than employees of the Company or use the same for any purposes (other than in the performance of his duties as an employee of the Company) without written approval by an officer of the Company, either during or after his employment with the Company, unless and until such Proprietary Information has been disclosed publicly by the Company. While employed by the Company, the Employee will use the Employee's best efforts to prevent unauthorized publication or disclosure of any of the Company's Proprietary Information.

(b)    The Employee agrees that all files, documents, letters, memoranda, reports, records, data, sketches, drawings, models, laboratory notebooks, program listings, computer equipment or devices, computer programs or other written, photographic, or other tangible or intangible material containing Proprietary Information, whether created by the Employee or others, which shall come into his custody or possession, shall be and are the exclusive property of the Company to be used by the Employee only in the performance of his duties for the Company and shall not be copied or removed from the Company premises except in the pursuit of the business of the Company. All such materials or copies thereof and all

tangible property of the Company in the custody or possession of the Employee shall be delivered to the Company, upon the earlier of (i) a request by the Company or (ii) termination of his employment. After such delivery, the Employee shall not retain any such materials or copies thereof or any such tangible property.

(c)     The Employee agrees that his obligation not to disclose or to use information and materials of the types set forth in paragraphs (a) and (b) above, and his obligation to return materials and tangible property, set forth in paragraph (b) above, also extends to such types of information, materials and tangible property of customers of the Company or suppliers to the Company or other third parties who may have disclosed or entrusted the same to the Company or to the Employee in the course of the Company's business.

3.      Developments.

(a)     The Employee will make full and prompt disclosure to the Company of all discoveries, inventions, improvements, enhancements, processes, methods, techniques, developments, software, and works of authorship, whether patentable or not, which are created, made, conceived or reduced to practice by him or under his direction or jointly with others during his employment by the Company, whether or not during normal working hours or on the premises of the Company (all of which are collectively referred to in this Agreement as "Developments").

(b)     The Employee agrees to assign and does hereby assign to the Company (or any person or entity designated by the Company) all his right, title and interest in and to (i) all Developments and all related patents, patent applications, copyrights and copyright applications and (ii) all developments listed and described on the "Schedule of Contributed Works" attached hereto as Schedule I. However, clause (i) of this paragraph 3(b) shall not apply to discoveries, inventions, improvements, enhancements, processes, methods, techniques, developments, software and works of authorship which do not relate to the business or research and development conducted or planned to be conducted by the Company at the time such discovery, invention, improvement, enhancement, process, method, technique, development, software or work of authorship is created, made, conceived or reduced to practice and which are made and conceived by the Employee not during normal working hours, not on the Company's premises and not using the Company's tools, devices, equipment or Proprietary Information. In addition, the items identified on the "Schedule of Separate Works" attached hereto as Schedule II shall not be assigned by the Employee pursuant to this Agreement. The Employee understands that, to the extent this Agreement shall be construed in accordance with the laws of any state which precludes a requirement in an employee agreement to assign certain classes of inventions made by an employee, this paragraph 3(b) shall be interpreted not to apply to any invention which a court rules and/or the Company agrees falls within such classes. The Employee also hereby waives all claims to moral rights in any Developments assigned to the Company.

(c)     The Employee agrees to cooperate fully with the Company, both during and after his employment with the Company, with respect to the procurement, maintenance and enforcement of copyrights, patents and other intellectual property rights (both in the United States and foreign countries) relating to Developments. The Employee shall sign all papers, including, without limitation, copyright applications, patent applications, declarations, oaths,

2

formal assignments, assignments of priority rights, and powers of attorney, which the Company may deem necessary or desirable in order to protect its rights and interests in any Development. The Employee further agrees that if the Company is unable, after reasonable effort, to secure the signature of the Employee on any such papers, any executive officer of the Company shall be entitled to execute any such papers as the agent and the attorney-in-fact of the Employee, and the Employee hereby irrevocably designates and appoints each executive officer of the Company as his agent and attorney-in-fact to execute any such papers on his behalf, and to take any and all actions as the Company may deem necessary or desirable in order to protect its rights and interests in any Development, under the conditions described in this sentence. The Company shall provide notice to the Employee of the execution of any papers pursuant to the immediately preceding sentence by mail addressed to the Employee at his most recent address on the Company's records.

4.  Non-Competition and Non-Solicitation.

(a)  While the Employee is employed by the Company and for a period of twelve months after the termination or cessation of such employment for any reason, the Employee will not directly or indirectly:

(i)  engage or assist others in engaging in any business or enterprise (whether as owner, partner, officer, director, employee, consultant, investor, lender or otherwise, except as the holder of not more than 1 % of the outstanding stock of a publicly-held company) that is competitive with the Company's business, including, but not limited to LocalLaunch (RH Donnelley), Leads.com (Website Pros), Ambassador Yellow Pages, Verizon Superpages (Idearc) or Yellowpages.com, or any other business or enterprise that develops, manufactures, markets, licenses, sells or provides any product or service that competes with any product or service developed, manufactured, marketed, licensed, sold or provided, or planned to be developed, manufactured, marketed, licensed, sold or provided, by the Company while the Employee was employed by the Company; or

(ii)  either alone or in association with others, divert or take away, or attempt to divert or take away, the business or patronage of any of the clients, customers, or business partners of the Company; or

(iii)  either alone or in association with others solicit, induce or attempt to induce, any employee or independent contractor of the Company to terminate his or her employment or other engagement with the Company, or to hire or engage any such employee or independent contractor.

(b)  If the Employee violates the provisions of any of the preceding paragraphs of this paragraph 4, the duration of the restrictions set forth in such paragraph shall be extended by the duration of the Employee's violation of such provisions.

5.  Other Agreements.

The Employee represents that, except as the Employee has disclosed in writing to the Company, the Employee is not bound by the terms of any agreement with any previous employer or other party to refrain from using or disclosing any trade secret or confidential or proprietary

directly or indirectly, with the business of such previous employer or any other party or to refrain from soliciting employees, customers or suppliers of such previous employer or other party. The Employee further represents that his performance of all the terms of this Agreement and the performance of his duties as an employee of the Company do not and will not conflict with or breach any agreement with any prior employer or other party to which the Employee is a party (including without limitation any nondisclosure or non-competition agreement), and that the Employee will not disclose to the Company or induce the Company to use any confidential or proprietary information or material belonging to any previous employer or others.

by him or her. The Employee expressly consents to be bound by the provisions of this Agreement for the benefit of the Company or any subsidiary or affiliate thereof to whose employ the Employee may be transferred without the necessity that this Agreement be re-signed at the time of such transfer. Notwithstanding the foregoing, if the Company is merged with or into a third party which is engaged in multiple lines of business, or if a third party engaged in multiple lines of business succeeds to the Company's assets or business, then for purposes of paragraph 4(a), the term "Company" shall mean and refer to the business of the Company as it existed immediately prior to such event and as it subsequently develops and not to the third party's other businesses.

(f)     If any restriction set forth in paragraph 4 is found by any court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities or in too broad a geographic area, it shall be interpreted to extend only over the maximum period of time, range of activities or geographic area as to which it may be enforceable.

(g)     In case any provision of this Agreement shall be invalid, illegal or otherwise unenforceable, the validity, legality and enforceability of the remaining provisions shall in no way be affected or impaired thereby.

(h)     No delay or omission by the Company in exercising any right under this Agreement will operate as a waiver of that or any other right. A waiver or consent given by the Company on any one occasion is effective only in that instance and will not be construed as a bar to or waiver of any right on any other occasion.

(i)     This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania (without reference to the conflicts of laws provisions thereof). Any action, suit, or other legal proceeding which is commenced to resolve any matter arising under or relating to any provision of this Agreement shall be commenced only in a court of the Commonwealth of Pennsylvania (or, if appropriate, a federal court located within Pennsylvania), and the Company and the Employee each consents to the jurisdiction of such a court. The Company and the Employee each hereby irrevocably waive any right to a trial by jury in any action, suit or other legal proceeding arising under or relating to any provision of this Agreement.

(j)     This Agreement supersedes all prior agreements, written or oral, between the Employee and the Company relating to the subject matter of this Agreement. This Agreement may not be modified, changed or discharged in whole or in part, except by an agreement in writing signed by the Employee and the Company. The Employee agrees that any change or changes in his duties, salary or compensation after the signing of this Agreement shall not affect the validity or scope of this Agreement.

**THE EMPLOYEE ACKNOWLEDGES THAT HE HAS CAREFULLY READ THIS AGREEMENT AND UNDERSTANDS AND AGREES TO ALL OF THE PROVISIONS IN THIS AGREEMENT.**

GEDOCS\465016.1

YODLE, INC., INC.

By: _____

    Name: Court Cunningham
    Title: CEO

EMPLOYEE

_____

Printed Name:

Ronald Pousson

GSDOCS\1652916.1

## SCHEDULE I

**Schedule of Contributed Works**

# EXHIBIT B

## INVENTION, NON-DISCLOSURE, NON-COMPETITION
## AND NON-SOLICITATION AGREEMENT

This Agreement is made, effective as of __9/13__ ,2008, between Yodle, Inc., Inc., a Delaware corporation (hereinafter referred to collectively with its subsidiaries as the "Company"), and __Daniel Mousedis__ (the "Employee").

For good consideration and in consideration of the employment or continued employment of the Employee by the Company, and intending to be legally bound, the Employee and the Company agree as follows:

### 1.    Condition of Employment.

The Employee acknowledges that his employment and/or the continuance of that employment with the Company is contingent upon his agreement to sign and adhere to the provisions of this Agreement. The Employee further acknowledges that the nature of the Company's business is such that protection of its proprietary and confidential information is critical to the survival and success of the Company's business.

### 2.    Proprietary and Confidential Information.

(a)    The Employee agrees that all information and know-how, whether or not in writing, of a private, secret or confidential nature concerning the Company's business or financial affairs (collectively, "Proprietary Information") is and shall be the exclusive property of the Company. By way of illustration, but not limitation, Proprietary Information may include discoveries, inventions, products, product improvements, product enhancements, processes, methods, techniques, formulas, compositions, compounds, negotiation strategies and positions, projects, developments, plans (including business and marketing plans), research data, clinical data, financial data (including sales costs, profits, pricing methods), personnel data, computer programs (including software used pursuant to a license agreement), customer, prospect and supplier lists, and contacts at or knowledge of customers or prospective customers of the Company. The Employee will not disclose any Proprietary Information to any person or entity other than employees of the Company or use the same for any purposes (other than in the performance of his duties as an employee of the Company) without written approval by an officer of the Company, either during or after his employment with the Company, unless and until such Proprietary Information has been disclosed publicly by the Company. While employed by the Company, the Employee will use the Employee's best efforts to prevent unauthorized publication or disclosure of any of the Company's Proprietary Information.

(b)    The Employee agrees that all files, documents, letters, memoranda, reports, records, data, sketches, drawings, models, laboratory notebooks, program listings, computer equipment or devices, computer programs or other written, photographic, or other tangible or intangible material containing Proprietary Information, whether created by the Employee or others, which shall come into his custody or possession, shall be and are the exclusive property of the Company to be used by the Employee only in the performance of his duties for the Company and shall not be copied or removed from the Company premises except in the pursuit of the business of the Company. All such materials or copies thereof and all

tangible property of the Company in the custody or possession of the Employee shall be delivered to the Company, upon the earlier of (i) a request by the Company or (ii) termination of his employment. After such delivery, the Employee shall not retain any such materials or copies thereof or any such tangible property.

(c)    The Employee agrees that his obligation not to disclose or to use information and materials of the types set forth in paragraphs (a) and (b) above, and his obligation to return materials and tangible property, set forth in paragraph (b) above, also extends to such types of information, materials and tangible property of customers of the Company or suppliers to the Company or other third parties who may have disclosed or entrusted the same to the Company or to the Employee in the course of the Company's business.

3.    Developments.

(a)    The Employee will make full and prompt disclosure to the Company of all discoveries, inventions, improvements, enhancements, processes, methods, techniques, developments, software, and works of authorship, whether patentable or not, which are created, made, conceived or reduced to practice by him or under his direction or jointly with others during his employment by the Company, whether or not during normal working hours or on the premises of the Company (all of which are collectively referred to in this Agreement as "Developments").

(b)    The Employee agrees to assign and does hereby assign to the Company (or any person or entity designated by the Company) all his right, title and interest in and to (i) all Developments and all related patents, patent applications, copyrights and copyright applications and (ii) all Developments listed and described on the "Schedule of Contributed Works" attached hereto as Schedule I. However, clause (i) of this paragraph 3(b) shall not apply to discoveries, inventions, improvements, enhancements, processes, methods, techniques, developments, software and works of authorship which do not relate to the business or research and development conducted or planned to be conducted by the Company at the time such discovery, invention, improvement, enhancement, process, method, technique, development, software or work of authorship is created, made, conceived or reduced to practice and which are made and conceived by the Employee not during normal working hours, not on the Company's premises and not using the Company's tools, devices, equipment or Proprietary Information. In addition, the items identified on the "Schedule of Separate Works" attached hereto as Schedule II shall not be assigned by the Employee pursuant to this Agreement. The Employee understands that, to the extent this Agreement shall be construed in accordance with the laws of any state which precludes a requirement in an employee agreement to assign certain classes of inventions made by an employee, this paragraph 3(b) shall be interpreted not to apply to any invention which a court rules and/or the Company agrees falls within such classes. The Employee also hereby waives all claims to moral rights in any Developments assigned to the Company.

(c)    The Employee agrees to cooperate fully with the Company, both during and after his employment with the Company, with respect to the procurement, maintenance and enforcement of copyrights, patents and other intellectual property rights (both in the United States and foreign countries) relating to Developments. The Employee shall sign all papers, including, without limitation, copyright applications, patent applications, declarations, oaths,

2

formal assignments, assignments of priority rights, and powers of attorney, which the Company may deem necessary or desirable in order to protect its rights and interests in any Development. The Employee further agrees that if the Company is unable, after reasonable effort, to secure the signature of the Employee on any such papers, any executive officer of the Company shall be entitled to execute any such papers as the agent and the attorney-in-fact of the Employee, and the Employee hereby irrevocably designates and appoints each executive officer of the Company as his agent and attorney-in-fact to execute any such papers on his behalf, and to take any and all actions as the Company may deem necessary or desirable in order to protect its rights and interests in any Development, under the conditions described in this sentence. The Company shall provide notice to the Employee of the execution of any papers pursuant to the immediately preceding sentence by mail addressed to the Employee at his most recent address on the Company's records.

4.    Non-Competition and Non-Solicitation.

(a)    While the Employee is employed by the Company and for a period of twelve months after the termination or cessation of such employment for any reason, the Employee will not directly or indirectly:

(i)    engage or assist others in engaging in any business or enterprise (whether as owner, partner, officer, director, employee, consultant, investor, lender or otherwise, except as the holder of not more than 1 % of the outstanding stock of a publicly-held company) that is competitive with the Company's business, including, but not limited to LocalLaunch (RH Donnelley), Leads.com (Website Pros), Ambassador Yellow Pages, Verizon Superpages (Idearc) or Yellowpages.com, or any other business or enterprise that develops, manufactures, markets, licenses, sells or provides any product or service that competes with any product or service developed, manufactured, marketed, licensed, sold or provided, or planned to be developed, manufactured, marketed, licensed, sold or provided, by the Company while the Employee was employed by the Company; or

(ii)   either alone or in association with others, divert or take away, or attempt to divert or take away, the business or patronage of any of the clients, customers, or business partners of the Company; or

(iii)  either alone or in association with others solicit, induce or attempt to induce, any employee or independent contractor of the Company to terminate his or her employment or other engagement with the Company, or to hire or engage any such employee or independent contractor.

(b)    If the Employee violates the provisions of any of the preceding paragraphs of this paragraph 4, the duration of the restrictions set forth in such paragraph shall be extended by the duration of the Employee's violation of such provisions.

5.    Other Agreements.

The Employee represents that, except as the Employee has disclosed in writing to the Company, the Employee is not bound by the terms of any agreement with any previous employer or other party to refrain from using or disclosing any trade secret or confidential or proprietary

GSDOCS\1652916.1

3

information in the course of his employment with the Company, to refrain from competing, directly or indirectly, with the business of such previous employer or any other party or to refrain from soliciting employees, customers or suppliers of such previous employer or other party. The Employee further represents that his performance of all the terms of this Agreement and the performance of his duties as an employee of the Company do not and will not conflict with or breach any agreement with any prior employer or other party to which the Employee is a party (including without limitation any nondisclosure or non-competition agreement), and that the Employee will not disclose to the Company or induce the Company to use any confidential or proprietary information or material belonging to any previous employer or others.

6.      United States Government Obligations.

The Employee acknowledges that the Company from time to time may have agreements with other persons or with the United States Government, or agencies thereof, which impose obligations or restrictions on the Company regarding inventions made during the course of work under such agreements or regarding the confidential nature of such work. The Employee agrees to be bound by all such obligations and restrictions which are made known to the Employee and to take all action necessary to discharge the obligations of the Company under such agreements.

7.      Miscellaneous.

(a)      The restrictions contained in this Agreement are necessary for the protection of the business and goodwill of the Company and are considered by the Employee to be reasonable for such purpose. The Employee agrees that any breach of this Agreement is likely to cause the Company substantial and irrevocable damage which is difficult to measure. Therefore, in the event of any such breach or threatened breach, the Employee agrees that the Company, in addition to such other remedies which may be available, shall have the right to obtain an injunction from a court restraining such a breach or threatened breach and the right to specific performance of the provisions of this Agreement and the Employee hereby waives the adequacy of a remedy at law as a defense to such relief.

(b)      The Employee acknowledges and represents that this agreement and the Employee's employment with the Company will not violate any continuing obligation the Employee has to any former employer or other third party.

(c)      The Employee hereby authorizes the Company to notify others, including but not limited to customers of the Company and any of the Employee's future employers or prospective business associates, of the terms and existence of this Agreement and the Employee's continuing obligations to the Company hereunder.

(d)      The Employee acknowledges that this Agreement does not constitute a contract of employment, does not imply that the Company will continue his employment for any period of time and does not change the at-will nature of his employment.

(e)      This Agreement shall be binding upon and inure to the benefit of both parties and their respective successors and assigns, including any corporation with which, or into which, the Company may be merged or which may succeed to the Company's assets or business, provided, however, that the obligations of the Employee are personal and shall not be assigned

by him or her. The Employee expressly consents to be bound by the provisions of this Agreement for the benefit of the Company or any subsidiary or affiliate thereof to whose employ the Employee may be transferred without the necessity that this Agreement be re-signed at the time of such transfer. Notwithstanding the foregoing, if the Company is merged with or into a third party which is engaged in multiple lines of business, or if a third party engaged in multiple lines of business succeeds to the Company's assets or business, then for purposes of paragraph 4(a), the term "Company" shall mean and refer to the business of the Company as it . existed immediately prior to such event and as it subsequently develops and not to the third party's other businesses.

      (f)    If any restriction set forth in paragraph 4 is found by any court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities or in too broad a geographic area, it shall be interpreted to extend only over the maximum period of time, range of activities or geographic area as to which it may be enforceable.

      (g)    In case any provision of this Agreement shall be invalid, illegal or otherwise unenforceable, the validity, legality and enforceability of the remaining provisions shall in no way be affected or impaired thereby.

      (h)    No delay or omission by the Company in exercising any right under this Agreement will operate as a waiver of that or any other right. A waiver or consent given by the Company on any one occasion is effective only in that instance and will not be construed as a bar to or waiver of any right on any other occasion.

      (i)    This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania (without reference to the conflicts of laws provisions thereof). Any action, suit, or other legal proceeding which is commenced to resolve any matter arising under or relating to any provision of this Agreement shall be commenced only in a court of the Commonwealth of Pennsylvania (or, if appropriate, a federal court located within Pennsylvania), and the Company and the Employee each consents to the jurisdiction of such a court. The Company and the Employee each hereby irrevocably waive any right to a trial by jury in any action, suit or other legal proceeding arising under or relating to any provision of this Agreement.

      (j)    This Agreement supersedes all prior agreements, written or oral, between the Employee and the Company relating to the subject matter of this Agreement. This Agreement may not be modified, changed or discharged in whole or in part, except by an agreement in writing signed by the Employee and the Company. The Employee agrees that any change or changes in his duties, salary or compensation after the signing of this Agreement shall not affect the validity or scope of this Agreement.

**THE EMPLOYEE ACKNOWLEDGES THAT HE HAS CAREFULLY READ THIS AGREEMENT AND UNDERSTANDS AND AGREES TO ALL OF THE PROVISIONS IN THIS AGREEMENT.**

GSDOCS\1652916.1

YODLE, INC., INC.

By: _____

     Name: Court Cunningham
     Title: CEO

EMPLOYEE

Printed Name: Daniel Mousetis

# EXHIBIT C

## INVENTION, NON-DISCLOSURE, NON-COMPETITION
## AND NON-SOLICITATION AGREEMENT

This Agreement is made, effective as of _7-24-_____,2008, between Yodle, Inc., Inc., a Delaware corporation (hereinafter referred to collectively with its subsidiaries as the "Company"), and _Christopher C. Eagre_____ (the "Employee").

For good consideration and in consideration of the employment or continued employment of the Employee by the Company, and intending to be legally bound, the Employee and the Company agree as follows:

1.  Condition of Employment.

The Employee acknowledges that his employment and/or the continuance of that employment with the Company is contingent upon his agreement to sign and adhere to the provisions of this Agreement. The Employee further acknowledges that the nature of the Company's business is such that protection of its proprietary and confidential information is critical to the survival and success of the Company's business.

2.  Proprietary and Confidential Information.

(a)    The Employee agrees that all information and know-how, whether or not in writing, of a private, secret or confidential nature concerning the Company's business or financial affairs (collectively, "Proprietary Information") is and shall be the exclusive property of the Company. By way of illustration, but not limitation, Proprietary Information may include discoveries, inventions, products, product improvements, product enhancements, processes, methods, techniques, formulas, compositions, compounds, negotiation strategies and positions, projects, developments, plans (including business and marketing plans), research data, clinical data, financial data (including sales costs, profits, pricing methods), personnel data, computer programs (including software used pursuant to a license agreement), customer, prospect and supplier lists, and contacts at or knowledge of customers or prospective customers of the Company. The Employee will not disclose any Proprietary Information to any person or entity other than employees of the Company or use the same for any purposes (other than in the performance of his duties as an employee of the Company) without written approval by an officer of the Company, either during or after his employment with the Company, unless and until such Proprietary Information has been disclosed publicly by the Company. While employed by the Company, the Employee will use the Employee's best efforts to prevent unauthorized publication or disclosure of any of the Company's Proprietary Information.

(b)    The Employee agrees that all files, documents, letters, memoranda, reports, records, data, sketches, drawings, models, laboratory notebooks, program listings, computer equipment or devices, computer programs or other written, photographic, or other tangible or intangible material containing Proprietary Information, whether created by the Employee or others, which shall come into his custody or possession, shall be and are the exclusive property of the Company to be used by the Employee only in the performance of his duties for the Company and shall not be copied or removed from the Company premises except in the pursuit of the business of the Company. All such materials or copies thereof and all

tangible property of the Company in the custody or possession of the Employee shall be delivered to the Company, upon the earlier of (i) a request by the Company or (ii) termination of his employment. After such delivery, the Employee shall not retain any such materials or copies thereof or any such tangible property.

(c)     The Employee agrees that his obligation not to disclose or to use information and materials of the types set forth in paragraphs (a) and (b) above, and his obligation to return materials and tangible property, set forth in paragraph (b) above, also extends to such types of information, materials and tangible property of customers of the Company or suppliers to the Company or other third parties who may have disclosed or entrusted the same to the Company or to the Employee in the course of the Company's business.

3.     Developments.

(a)     The Employee will make full and prompt disclosure to the Company of all discoveries, inventions, improvements, enhancements, processes, methods, techniques, developments, software, and works of authorship, whether patentable or not, which are created, made, conceived or reduced to practice by him or under his direction or jointly with others during his employment by the Company, whether or not during normal working hours or on the premises of the Company (all of which are collectively referred to in this Agreement as "Developments").

(b)     The Employee agrees to assign and does hereby assign to the Company (or any person or entity designated by the Company) all his right, title and interest in and to (i) all Developments and all related patents, patent applications, copyrights and copyright applications and (ii) all developments listed and described on the "Schedule of Contributed Works" attached hereto as Schedule I. However, clause (i) of this paragraph 3(b) shall not apply to discoveries, inventions, improvements, enhancements, processes, methods, techniques, developments, software and works of authorship which do not relate to the business or research and development conducted or planned to be conducted by the Company at the time such discovery, invention, improvement, enhancement, process, method, technique, development, software or work of authorship is created, made, conceived or reduced to practice and which are made and conceived by the Employee not during normal working hours, not on the Company's premises and not using the Company's tools, devices, equipment or Proprietary Information. In addition, the items identified on the "Schedule of Separate Works" attached hereto as Schedule II shall not be assigned by the Employee pursuant to this Agreement. The Employee understands that, to the extent this Agreement shall be construed in accordance with the laws of any state which precludes a requirement in an employee agreement to assign certain classes of inventions made by an employee, this paragraph 3(b) shall be interpreted not to apply to any invention which a court rules and/or the Company agrees falls within such classes. The Employee also hereby waives all claims to moral rights in any Developments assigned to the Company.

(c)     The Employee agrees to cooperate fully with the Company, both during and after his employment with the Company, with respect to the procurement, maintenance and enforcement of copyrights, patents and other intellectual property rights (both in the United States and foreign countries) relating to Developments. The Employee shall sign all papers, including, without limitation, copyright applications, patent applications, declarations, oaths,

2

formal assignments, assignments of priority rights, and powers of attorney, which the Company may deem necessary or desirable in order to protect its rights and interests in any Development. The Employee further agrees that if the Company is unable, after reasonable effort, to secure the signature of the Employee on any such papers, any executive officer of the Company shall be entitled to execute any such papers as the agent and the attorney-in-fact of the Employee, and the Employee hereby irrevocably designates and appoints each executive officer of the Company as his agent and attorney-in-fact to execute any such papers on his behalf, and to take any and all actions as the Company may deem necessary or desirable in order to protect its rights and interests in any Development, under the conditions described in this sentence. The Company shall provide notice to the Employee of the execution of any papers pursuant to the immediately preceding sentence by mail addressed to the Employee at his most recent address on the Company's records.

4.  Non-Competition and Non-Solicitation.

(a)  While the Employee is employed by the Company and for a period of twelve months after the termination or cessation of such employment for any reason, the Employee will not directly or indirectly:

(i)  engage or assist others in engaging in any business or enterprise (whether as owner, partner, officer, director, employee, consultant, investor, lender or otherwise, except as the holder of not more than 1 % of the outstanding stock of a publicly-held company) that is competitive with the Company's business, including, but not limited to LocalLaunch (RH Donnelley), Leads.com (Website Pros), Ambassador Yellow Pages, Verizon Superpages (Idearc) or Yellowpages.com, or any other business or enterprise that develops, manufactures, markets, licenses, sells or provides any product or service that competes with any product or service developed, manufactured, marketed, licensed, sold or provided, or planned to be developed, manufactured, marketed, licensed, sold or provided, by the Company while the Employee was employed by the Company; or

(ii)  either alone or in association with others, divert or take away, or attempt to divert or take away, the business or patronage of any of the clients, customers, or business partners of the Company; or

(iii)  either alone or in association with others solicit, induce or attempt to induce, any employee or independent contractor of the Company to terminate his or her employment or other engagement with the Company, or to hire or engage any such employee or independent contractor.

(b)  If the Employee violates the provisions of any of the preceding paragraphs of this paragraph 4, the duration of the restrictions set forth in such paragraph shall be extended by the duration of the Employee's violation of such provisions.

5.  Other Agreements.

The Employee represents that, except as the Employee has disclosed in writing to the Company, the Employee is not bound by the terms of any agreement with any previous employer or other party to refrain from using or disclosing any trade secret or confidential or proprietary

information in the course of his employment with the Company, to refrain from competing, directly or indirectly, with the business of such previous employer or any other party or to refrain from soliciting employees, customers or suppliers of such previous employer or other party. The Employee further represents that his performance of all the terms of this Agreement and the performance of his duties as an employee of the Company do not and will not conflict with or breach any agreement with any prior employer or other party to which the Employee is a party (including without limitation any nondisclosure or non-competition agreement), and that the Employee will not disclose to the Company or induce the Company to use any confidential or proprietary information or material belonging to any previous employer or others.

6.    United States Government Obligations.

The Employee acknowledges that the Company from time to time may have agreements with other persons or with the United States Government, or agencies thereof, which impose obligations or restrictions on the Company regarding inventions made during the course of work under such agreements or regarding the confidential nature of such work. The Employee agrees to be bound by all such obligations and restrictions which are made known to the Employee and to take all action necessary to discharge the obligations of the Company under such agreements.

7.    Miscellaneous.

(a)    The restrictions contained in this Agreement are necessary for the protection of the business and goodwill of the Company and are considered by the Employee to be reasonable for such purpose. The Employee agrees that any breach of this Agreement is likely to cause the Company substantial and irrevocable damage which is difficult to measure. Therefore, in the event of any such breach or threatened breach, the Employee agrees that the Company, in addition to such other remedies which may be available, shall have the right to obtain an injunction from a court restraining such a breach or threatened breach and the right to specific performance of the provisions of this Agreement and the Employee hereby waives the adequacy of a remedy at law as a defense to such relief.

(b)    The Employee acknowledges and represents that this agreement and the Employee's employment with the Company will not violate any continuing obligation the Employee has to any former employer or other third party.

(c)    The Employee hereby authorizes the Company to notify others, including but not limited to customers of the Company and any of the Employee's future employers or prospective business associates, of the terms and existence of this Agreement and the Employee's continuing obligations to the Company hereunder.

(d)    The Employee acknowledges that this Agreement does not constitute a contract of employment, does not imply that the Company will continue his employment for any period of time and does not change the at-will nature of his employment.

(e)    This Agreement shall be binding upon and inure to the benefit of both parties and their respective successors and assigns, including any corporation with which, or into which, the Company may be merged or which may succeed to the Company's assets or business, provided, however, that the obligations of the Employee are personal and shall not be assigned

by him or her. The Employee expressly consents to be bound by the provisions of this Agreement for the benefit of the Company or any subsidiary or affiliate thereof to whose employ the Employee may be transferred without the necessity that this Agreement be re-signed at the time of such transfer. Notwithstanding the foregoing, if the Company is merged with or into a third party which is engaged in multiple lines of business, or if a third party engaged in multiple lines of business succeeds to the Company's assets or business, then for purposes of paragraph 4(a). the term "Company" shall mean and refer to the business of the Company as it existed immediately prior to such event and as it subsequently develops and not to the third party's other businesses.

(f)     If any restriction set forth in paragraph 4 is found by any court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities or in too broad a geographic area, it shall be interpreted to extend only over the maximum period of time, range of activities or geographic area as to which it may be enforceable.

(g)     In case any provision of this Agreement shall be invalid, illegal or otherwise unenforceable, the validity, legality and enforceability of the remaining provisions shall in no way be affected or impaired thereby.

(h)     No delay or omission by the Company in exercising any right under this Agreement will operate as a waiver of that or any other right. A waiver or consent given by the Company on any one occasion is effective only in that instance and will not be construed as a bar to or waiver of any right on any other occasion.

(i)     This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania (without reference to the conflicts of laws provisions thereof). Any action, suit, or other legal proceeding which is commenced to resolve any matter arising under or relating to any provision of this Agreement shall be commenced only in a court of the Commonwealth of Pennsylvania (or, if appropriate, a federal court located within Pennsylvania), and the Company and the Employee each consents to the jurisdiction of such a court. The Company and the Employee each hereby irrevocably waive any right to a trial by jury in any action, suit or other legal proceeding arising under or relating to any provision of this Agreement.

(j)     This Agreement supersedes all prior agreements, written or oral, between the Employee and the Company relating to the subject matter of this Agreement. This Agreement may not be modified, changed or discharged in whole or in part, except by an agreement in writing signed by the Employee and the Company. The Employee agrees that any change or changes in his duties, salary or compensation after the signing of this Agreement shall not affect the validity or scope of this Agreement.

**THE EMPLOYEE ACKNOWLEDGES THAT HE HAS CAREFULLY READ THIS AGREEMENT AND UNDERSTANDS AND AGREES TO ALL OF THE PROVISIONS IN THIS AGREEMENT.**

GSDOCS\1652916.1

YODLE, INC., INC.

By: _____

    Name: Court Cunningham
    Title: CEO

EMPLOYEE

*Christopher C. Esgro*

Printed Name: