IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| YODLE, INC., | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | No. |
| | : | |
| RONALD POUSSON, LOCAL | : | |
| INTERNET DOCTORS, INC., | : | |
| FRANK NORRIS, DANIEL | : | |
| MOUSETIS, and CHRISTOPHER | : | |
| ESGRO, | : | |
| | : | |
| Defendants. | : | |

### YODLE, INC.'S MEMORANDUM OF LAW
### IN SUPPORT OF ITS MOTION FOR A TEMPORARY
### RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

Plaintiff Yodle, Inc. ("Yodle") is an industry leader in providing local online advertising services to businesses around the country. It has expended a significant amount of money and resources to develop and acquire confidential and proprietary information relating to its customers and products, as well as training its sales force in the most effective sales methods and practices available. In order to protect its competitive advantage, Yodle has taken numerous steps to ensure that this confidential and proprietary information is kept out of the hands of its competitors. These defensive steps include requiring its sales force to enter into contracts whereby the individuals agree not to work for a competitor or solicit Yodle's clients or employees for a period of one (1) year and to permanently refrain from disclosing any of Yodle's proprietary information.

On December 11, 2009, Yodle learned that the defendants, Ronald Pousson ("Pousson"), Frank Norris ("Norris"), Daniel Mousetis ("Mousetis"), Christopher Esgro

("Esgro") and Local Internet Doctors, Inc. ("LID") (collectively, "Defendants") have embarked on a scheme to destroy Yodle's built-in protections and to sabotage its business. Although the extent of this scheme has yet to be fully uncovered, a preliminary analysis has revealed that three of its former employees, Pousson, Mousetis and Esgro, have been hacking into Yodle's computer database for at least six months and stealing Yodle's trade secrets. If this wasn't enough, these individuals, who each agreed not to compete with Yodle for a period of one year, have used this proprietary information in order to allow Pousson to establish a company directly competing with Yodle, and to employ Esgro with that competing company. Defendants have knowingly and unlawfully obtained Yodle's trade secrets in an attempt to wage unfair competition against Yodle, including the solicitation of Yodle's employees, the unauthorized use of proprietary information to steal Yodle's clients, and the unlawful disclosure of this information to fellow Yodle competitors. If not for the reporting of Defendants' unlawful activity by one of Yodle's competitors, Yodle might still be an unknowing victim of this unlawful scheme.

To prevent Defendants from continuing to use their scheme to inflict significant and irreparable injury on Yodle, it respectfully requests the entrance of a Temporary Restraining Order and, after a hearing, a Preliminary Injunction, requiring, among other things, that Defendants, and anybody acting in concert with them, cease accessing, using and disclosing Yodle's trade secrets.

## STATEMENT OF FACTS

**A.    Yodle's Business**

Yodle is a leader in the online advertising industry. (*Verified Cmpt.*, ¶ 10). In general, Yodle provides its services in three steps. (Id.) First, Yodle creates and publishes

advertisements on behalf of its clients that will appear in relevant searches on major internet search engines like Yahoo! and Google. (Id.) Second, Yodle drives leads to clients' websites (and assists clients in building custom websites called "adverSites"). (Id.) Third, Yodle tracks its clients' leads and helps them optimize their advertising efforts via Yodle's proprietary lead management and call tracking tools. (Id.) Yodle operates its nationwide business through five physical locations, one of which is based out of Philadelphia. (Id.).

Yodle maintains electronic databases that are replete with confidential and proprietary information. Its employees are provided with varying levels of direct access to Yodle's confidential database, known as "Yodle Live," depending upon their level of responsibility. (Id., ¶ 11). Yodle Live includes, among other items, confidential information concerning customers and prospective customers; customer performance data; churn data; customer contact information; client status (e.g., active or inactive); and sales information. (Id.). Such confidential information is proprietary to Yodle, and not readily available to the public. (Id., ¶ 12). All of this confidential information was developed for, or by, Yodle, for Yodle's exclusive use, often through years of strategic development and refinement. (Id.). Yodle takes steps to protect its confidential and proprietary business information. (Id.).

In order to protect the proprietary information contained on Yodle Live, including its most effective sales practices and techniques, Yodle requires that each of its employees enter into an Invention, Non-Disclosure, Non-Competition, and Non-Solicitation Agreement (the "Noncompete"). (Id., ¶¶ 14-15). The Noncompete contains a perpetual commitment barring its employees from disclosing confidential Yodle information, including information regarding Yodle's customers:

> The Employee agrees that all information and know-how, whether or not in writing, of a private, secret or confidential nature concerning the

> Company's business or financial affairs (collectively, "Proprietary Information") is and shall be the exclusive property of the Company. By way of illustration, but not limitation, Proprietary Information may include discoveries, inventions, products, product improvements, product enhancements, processes, methods, developments, plans (including business and marketing plans), research data, clinical data, financial data (including sales costs, profits, pricing methods), personnel data, computer programs (including software used pursuant to a license agreement), customer, prospect and supplier lists, and contacts at or knowledge of customers or prospective customers of the Company. The Employee will not disclose any Proprietary Information to any person or entity other than employees of the Company or use the same for any purposes (other than in the performance of his duties as an employee of the Company) without written approval by an officer of the Company, either during or after his employment with the Company, unless and until such Proprietary Information has been disclosed publicly by the Company.

(Id., ¶ 16). The Noncompete also precludes Yodle's former employees from competing with, or from soliciting Yodle's customers or employees, for a period of one (1) year following the conclusion of that individual's employment. (Id., ¶ 17). The Noncompete states, in pertinent part, that

> (a) While the Employee is employed by the Company and for a period of twelve months after the termination or cessation of such employment for any reason, the Employee will not directly or indirectly:
>
> (i) engage or assist others in engaging in any business or enterprise... that develops, manufactures, markets, licenses, sells or provides any product or service that competes with any product or service developed, manufactured, marketed, licensed, sold or provided, or planned to be developed, manufactured, marketed, licensed, sold or provided, by the Company while the Employee was employed by the Company; or
>
> (ii) either alone or in association with others, divert or take away, or attempt to divert or take away, the business or patronage of any of the clients, customers, or business partners of the Company.
>
> (iii) either alone or in association with others solicit, induce, or attempt to induce, any employee or independent contractor

of the Company to terminate his or her employment or other engagement with the Company, or to hire or engage any such employee or independent contractor.

(b) If the Employee violates the provisions of any of the preceding paragraphs of this paragraph 4, the duration of the restrictions set forth in such paragraph shall be extended by the duration the Employee's violation of such provisions.

(Id.) Yodle requires employees to sign the Noncompete to protect its trade secrets. (Id., ¶ 15).

## B. Pousson, Mousetis and Esgro's Employment with Yodle

Pousson began working for Yodle in December of 2007. (Id., ¶ 13). In connection with his employment, Pousson entered into the standard Yodle Noncompete by which he agreed, for one year, not to compete with Yodle or solicit its customers or employees, and to permanently refrain from disclosing its proprietary information. (Id., ¶¶ 13-14, 16-17). Pousson was a City Manager and, as such, was responsible for managing and overseeing Yodle's workforce assigned to its Philadelphia location. (Id., ¶ 13) Among other employees, Pousson hired and supervised both Mousetis and Esgro, who, like Pousson, each executed a Yodle Noncompete. (Id., ¶¶ 16-18, 22).

During his tenure with Yodle, Pousson actively participated in senior level strategic planning meetings regarding sales strategy. (Id., ¶ 18). As a City Manager, he was exposed to and entrusted with substantial Yodle confidential and proprietary information, including, but not limited to, customer satisfaction data, Yodle specific target segments and sales strategies, highest performing and most valuable segments, hiring profiles, current and potential customer information, financial goals, performance metrics, and Yodle's product pipeline. (Id., ¶ 19).

On June 5, 2009, Pousson was terminated from Yodle. (Id., ¶ 20). In connection with his termination, Pousson entered into a Separation Agreement in which he reaffirmed his

obligations under the Noncompete in exchange for severance pay, among other benefits. (Id., ¶ 21). Mousetis was also terminated from Yodle in June 2009. (Id., ¶ 22). Esgro abandoned his job in August 2009. (Id.).

## C. Yodle's Discovery of Defendants' Unlawful Campaign

Pousson has violated his Noncompete by soliciting Yodle's current employees. (Id., ¶ 23). Specifically, in November 2009, Pousson contacted a current Yodle employee, Tarek Osman ("Osman"), through the online social networking site, Facebook. (Id.). During this conversation, Pousson represented that he was working for a Yodle competitor, WebVisible, Inc. ("WebVisible"), and that Esgro had come to work for him. (Id.). Pousson began inquiring about Yodle's financial situation and requested that Osman leave his employment with Yodle and come to work with him and Esgro at WebVisible. (Id.).

Pousson, however, was not even working for WebVisible. (Id., ¶ 24). During the week of December 7, 2009, Yodle learned from WebVisible's Chief Executive Officer, Kirsten Mangers, that WebVisible was intending to issue a "Cease and Desist" letter to Pousson, demanding that he cease engaging in misrepresentations relating to WebVisible. (Id.). Yodle also learned during this conversation that Pousson founded LID. (Id.). According to its own website, localinternetdoctors.com, LID provides the exact same services as Yodle – local online advertising services. (Id., ¶ 25). LID is a competitor of Yodle that employs Esgro. (Id., ¶¶ 6, 25).

Yodle soon learned that, not only was Pousson soliciting its employees, but he was also hacking into its computer system. (Id., ¶ 26). On December 11, 2009, Yodle was informed by one of its competitors, Lance Bachmann, President of localinternettraffic.com, that Pousson had reportedly been accessing Yodle Live unlawfully. (Id.). By accessing Yodle Live,

Pousson can obtain the contact information of every potential customer to whom Yodle has issued a contract for at least the past thirty days (and likely longer), and can access a host of other competitively sensitive information relating to actual and potential customers. (Id., ¶ 11). During their conversation, Pousson told Mr. Bachmann that he had gained access to Yodle Live by using the username and password of a former Yodle employee and that he was using that unlawful access to download as much of Yodle's confidential and proprietary information as he could, including competitively sensitive information relating to Yodle's current and prospective customers. (Id. ¶ 26).

To verify his "accomplishments," Pousson sent a text message to Mr. Bachmann with confidential information relating to one of Yodle's prospective customers. (Id.). The text message included information relating to a potential Yodle customer: the customer's name, contact information, its monthly budget, and the terms of its pending contract with Yodle. (Id.). This information is confidential and proprietary, and, particularly because it relates to a prospective customer, is severely damaging to Yodle in the hands of one of its competitors. (Id.).

Upon learning this information, Yodle immediately conducted a forensic analysis of its computer servers. (Id., ¶ 27). It discovered that, for at least the past six months, Pousson has indeed been unlawfully accessing Yodle's server and downloading its confidential and proprietary information through accounts registered to both Mousetis and Esgro, dan@yodle.com and chrise@yodle.com, the two former employees who used to work for him. (Id., ¶ 27). Not surprisingly, Yodle's preliminary investigation revealed that the IP address which has used these accounts to unlawfully access Yodle Live is registered in Philadelphia. (Id.). However, the search also revealed that Pousson's unlawful actions went far beyond the

scope of what was reported by Mr. Bachmann. (Id.). Incredibly, Yodle discovered that Pousson has unlawfully accessed Yodle Live regarding no less than thirty-one (31) different customer accounts since his termination from Yodle, most recently on Thursday, December 10, 2009. (Id.). Yodle immediately took necessary steps to prevent any future unlawful access, including disabling the compromised accounts. (Id., ¶ 28).

Defendants have apparently learned that Yodle has discovered their unlawful actions. Over the last several days, Defendants have attempted to conceal their unlawful behavior by removing most references to Pousson's name from LID's website. (Id., ¶ 31). Defendants, however, have not been successful in covering all of their tracks. (Id.). As of December 13, 2009, the "About Us" page of LID's website proudly represents that the company was "co-founded by Frank Norris and Ron Pousson to serve the internet needs of businesses in Southeastern Pennsylvania, Delaware, and Maryland." (Id.).

Defendants' unlawful downloading, use, and retention of Yodle's confidential and proprietary information continues to cause irreparable injury to Yodle. (Id., ¶ 31). This information, in the hands of a competitor, will also cause extensive economic and business injury to Yodle. (Id., ¶ 32).

## ARGUMENT

Under Rule 65 of the Federal Rules of Civil Procedure, the Court should grant a temporary restraining order where, as here, a balancing of four factors favors the requested relief: (1) the likelihood that the movant will succeed on the merits; (2) the extent to which the movant would be irreparably harmed absent the preliminary relief; (3) the extent to which the non-moving party would be harmed; and (4) whether the public interest would be served by issuance of a temporary restraining order. Fed. R. Civ. P. 65; *Steven B. Golden Assocs. v.*

*Royal Consumer Prods.*, 2009 U.S. Dist. LEXIS 82883, *7 (E.D. Pa. 2009). In adjudicating a motion for a preliminary injunction, the Court must assess the same four factors. *See Quaker Chem. Corp. v. Varga*, 509 F. Supp. 2d 469, 478 (E.D. Pa. 2007).

Although Yodle expects to prevail on all of its counts, for purposes of this motion, it focuses on only three: misappropriation of Yodle's trade secrets, the former Yodle employees' breaches of their Noncompetes and conversion.

A. **Yodle Can Demonstrate A Reasonable Probability of Success on the Merits**

    1. **Yodle Is Likely to Prove That Defendants Misappropriated Its Trade Secrets and Confidential Information**

To establish a claim under Pennsylvania's version of the Uniform Trade Secrets Act, Yodle must show that Defendants "disclosed or used plaintiff's trade secret without consent and, at the time of disclosure, Defendants knew that their knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy." *E.g., EEOC v. Vanguard Group, Inc.*, No. 04-cv-4126, 2006 WL 931613, at *5 (E.D. Pa. Apr. 10, 2006) (quoting 12 Pa. Cons. Stat. Ann. § 5302).

Here, three of the individual defendants, Pousson, Mousetis and Esgro, each voluntarily entered into a Noncompete by which they agreed to maintain the confidentiality of Yodle's proprietary information. Pousson even reaffirmed his non-disclosure obligations less than six months ago in exchange for Yodle's agreement to provide him with additional monetary and other compensation. Defendants have willfully ignored their respective contractual obligations by unlawfully accessing Yodle's electronic database, downloading Yodle's confidential information, using it to compete with Yodle, and disclosing such information to at least one other Yodle competitor. Defendants' disclosure or use of the confidential information was without consent. *See, e.g., B & B Microscopes v. Armogida*, 532 F. Supp. 2d 744, 753-57

(E.D. Pa. 2007) (defendant liable for misappropriation of trade secrets where he refused employer's request to turn in laptop and instead deleted employer's confidential information from computer). Further, Pennsylvania law authorizes injunctive relief to prevent the threatened misappropriation of trade secrets. *See* 12 Pa. Cons. Stat. Ann. § 5303(a).

Turning to the second element of the claim, a trade secret exists where the plaintiff (1) has taken reasonable precautions to maintain the secrecy of the information in question and (2) derives independent economic value from the data not being readily known to, or ascertainable by, other persons who can obtain economic value from its disclosure or use. *E.g. B & B Microscopes*, 532 F. Supp. 2d at 756. Where, as here, an employer requires employees having access to proprietary information to abide by confidentiality policies, the element of reasonable precautions exists. *E.g., Den-Tal-Ez, Inc. v. Siemens Capital Corp.*, 566 A.2d 1214, 1230 (Pa. Super Ct. 1989). The same conclusion results where, as here, the information is password protected. *See A.M. Skier Agency, Inc. v. Gold*, 747 A.2d 936, 941 (Pa. Super. Ct. 2000). The items that Defendants have been stealing from Yodle Live includes such proprietary information as actual and prospective customers' contact information, performance data, churn data, and sales information, among other things. With continued unauthorized and illegal clicks of the mouse, Defendants have been able to obtain proprietary information relating to each prospective customer to whom Yodle has issued a contract in the last thirty days, and likely longer. Not only does this information allow Defendants to duplicate Yodle's proprietary sales program, but it permits them to know exactly what services Yodle is offering, and at what price, and therefore provides them with an opportunity to unfairly modify their services accordingly. Therefore, Yodle derives independent economic value from the confidential information. *E.g., Den-Tal-Ez, Inc.*, 566 A.2d at 1230. The confidential

information constitutes trade secrets. *See id.*

The final element of the claim is that Defendants were aware that their knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy. That element exists where, as here, individual defendants retain computer information after their former employer instructs them not to do so. *See, e.g., B & B Microscopes*, 532 F. Supp. 2d at 753-57 (defendant liable for misappropriation of trade secrets when he destroyed data on laptop after employer directed him to return laptop); *Calence, LLC v. Dimension Data Holdings*, No. C06-0262RSM, 2007 U.S. Dist. LEXIS 37725, at **10-12 (W.D. Wash. May 23, 2007) (UTSA liability can attach upon showing that former employee retained Blackberry in violation of former employer's directives and then accessed customer contact lists and emails). It also exists where Defendants have proactively gained access to Yodle's system through unauthorized accounts assigned to individuals who no longer work for Yodle. Defendants have essentially conceded as much by trying to conceal their unlawful behavior in the wake of Yodle's discovery.

Accordingly, Yodle has established that it is likely to succeed on the merits of its claim that Defendants have misappropriated its trade secrets.

### 2. Yodle is Likely to Prove that Pousson, Mousetis and Esgro Breached Their Noncompetes.

To enforce a noncompetition agreement, the agreement must be (i) ancillary to the taking of employment; (ii) supported by adequate consideration; (iii) reasonably limited in time and geographic scope; and (iv) reasonably designed to protect a legitimate employer interest. *National Bus. Servs., Inc. v. Wright*, 2 F. Supp. 2d 701, 707 (E.D. Pa. 1998); *Thermo-Guard, Inc. v. Chochran*, 596 A.2d 188, 193-94 (Pa. Super. Ct. 1991). "Pennsylvania cases have recognized that trade secrets of an employer, customer goodwill and specialized training and

skills acquired from the employer are all legitimate interests protectable through a general restrictive covenant." *Thermo-Guard*, 596 A.2d at 193-94 (citing *Morgan's Home Equip. Corp. v. Martucci*, 136 A.2d 838 (1957)); *see Volunteer Firemen's Ins. v. CIGNA Property & Cas. Ins. Agency*, 693 A.2d 1330, 1337-38 (Pa. Super. 1997) (finding that insurance company had legitimate protectable interests in confidential information and trade secret data related to its specialized coverages and distribution system).

Yodle easily meets all of the elements necessary for the Court to enforce the Noncompetes. In particular, the highly confidential information misappropriated by Pousson, Mousetis and Esgro clearly is of the nature meriting protection via a general restrictive covenant. By misappropriating that information, Pousson, Mousetis and Esgro each breached the reasonable and enforceable covenants they entered into upon the inception of their employment with Yodle. As such, Yodle has established that it is likely to succeed on the merits of its breach of contract claims against them.

### 3. Yodle Is Likely to Prove that Defendants Engaged in Conversion of Its Property

Under Pennsylvania law, conversion is "an act of willful interference with a chattel, done without lawful justification, by which any person entitled thereto is deprived of use and possession." *Norriton East Realty Corp. v. Central-Penn Nat'l Bank*, 435 Pa. 57, 60 (1969); *see also Am. Hearing Aid Assocs. v. GN ReSound N. Am.*, 309 F. Supp. 2d 694, 705 (E.D. Pa. 2004) (stating, "[a]ccording to Pennsylvania law, conversion is the deprivation of another's right of property, or use or possession of a chattel, or other interference therewith, without the owner's consent and without legal justification") (internal quotations omitted). Conversion is committed when, *inter alia*, the defendant unreasonably withholds possession of property from one who has the right to that property. *Norriton East Realty Corp.*, 435 Pa. at 60. Indeed, a

defendant "who has come rightfully into possession in the first instance . . . becomes a converter when he refuses to deliver on demand" the property at issue. *Id.* at 61. Tangible property, as well as trade secrets, can form the foundation of a conversion claim. *Am. Hearing Aid Assocs.*, 309 F. Supp. 2d at 705.

Here, Defendants undoubtedly have converted Yodle's property. Yodle has invested significant financial and other resources to develop and acquire a multitude of proprietary information relating to its business. It has developed, among other things, information relating to its potential customers, including contact information, target clientele, anticipated budgets, billing preferences, and terms of those customers' potential contracts. This information is critical to the ongoing success of Yodle, and has, in large part, hastened Yodle's ascension to the top of the local online advertising industry. This property, at least in part, is what helps separate Yodle from the many companies that have tried – but ultimately failed – to sustain a copycat business. Recognizing the importance of this information, Yodle has implemented measures to ensure that it stays out of the hands of its competitors, including requiring its employees, who are all provided with this proprietary information, to contractually agree that they will maintain the confidentiality of the information they acquired during their employment.

Despite Yodle's protective measures, Defendants have devised a way to unlawfully hack into Yodle's computer server, steal this information from Yodle, use it to poach Yodle's potential customers, and disclose this valuable information to other Yodle competitors. This is no isolated scheme. Yodle's forensic analysis has determined that Defendants have been utilizing this scheme for at least the past six months, and have accessed no less than thirty-one (31) different customer accounts. Pousson himself proudly proclaims that he is trying to steal

as much of Yodle's information as he can. Considering that Pousson has already disclosed some of this information to one of Yodle's competitors, it is clear that Defendants are using this proprietary information to damage Yodle and to steal its potential customers. Therefore, Yodle is likely to succeed on the merits of this claim and is entitled to injunctive relief to protect the integrity of the property that Defendants have converted.

**B.     Yodle Has Established Irreparable Harm**

Yodle has been an unknowing victim of Defendants' scheme for at least the past six months. During this time, Yodle has continued to develop and acquire its proprietary information, and store that information on what it believed was a secure electronic database. Little did Yodle know that its former employees were unlawfully obtaining, using and disclosing that information in order to unlawfully compete with it and to encourage other competitors to wage similar actions. This information has already provided Defendants with an unfair advantage and cannot now be retracted or become "unknown" to them. However, further use and disclosure of this information can be prevented. *See PharMerica, Inc. v. Arledge*, No. 8:07-cv-486-T-26MAP, 2007 U.S. Dist. LEXIS 19992, at *7, 21-22 (M.D. Fla. Mar. 21, 2007) (irreparable harm established where former employee's actions gave him access to plaintiff's "pricing analyses, schedules, and information" because such data, once transmitted to a competitor, cannot be "undisclose[d]"). Defendants' misappropriation of Yodle's proprietary data constitutes irreparable harm in and of itself for which injunctive relief is appropriate. *W.R. Huff Asset Mgmt. Co., L.L.C. v. Harmonay*, 235 Fed. Appx. 41, 43 (3d Cir. 2007) (noting that the district court had concluded that "irreparable harm exists to the extent that Defendants have retained any [of plaintiff's] Proprietary Information," and that the district court had ordered return of all data taken from plaintiff); *cf. Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1254 (3d Cir. 1983) ("the jeopardy to Apple's

investment and competitive position caused by Franklin's wholesale copying of many of its key operating programs would satisfy the requirement of irreparable harm needed to support a preliminary injunction.") Therefore, Yodle has demonstrated irreparable harm and is entitled to the injunctive relief sought.

C.  **The Harm To Defendants Is Entitled To Little Weight**

Defendants will not be significantly harmed if they are enjoined. Nothing contained in the relief Yodle seeks will prevent Defendants from developing or acquiring their own, independent customer information or sales strategies. In fact, the bulk of the conduct that will be enjoined – prohibiting Defendants from obtaining, using or disclosing Yodle's proprietary information and prohibiting the solicitation of Yodle customers and employees for a limited period of time – is the exact conduct that Defendants voluntarily agreed not to engage in. Further, Defendants were never entitled to access Yodle's proprietary information outside of employment for Yodle and it serves no lawful purpose in their possession. Defendants simply suffer no loss from return of that to which they were not entitled in the first place. In any event, even if their loss of possession of these materials could be seen as a harm to Defendants, where a defendant chose to violate his duties to his former employer, he "brought th[e] dispute on himself." *Quaker Chem.*, 509 F. Supp. 2d at 480. Under those circumstances, courts will not only conclude that the harm to the non-moving party does not preclude an injunction, they will find that this factor actually "weighs against" the defendant. *Id.* Indeed, "[t]he self-inflicted nature of any harm suffered by the wrongdoer . . . weighs heavily in favor of" injunctive relief. *Id.* Thus, this factor favors issuance of the injunctive relief sought by Yodle.

D.  **The Public Interest Favors Injunctive Relief**

In this case, the protection of Yodle's' confidential and trade secret information furthers the public interest, as codified in the UTSA, of protecting the Company's ownership of the

information it has developed. There is no aspect of the public interest that favors Defendants' retention of Yodle's property and confidential and trade secret information. Therefore, this factor also favors issuance of the injunctive relief Yodle seeks.

## CONCLUSION

Defendants, three of whom are former Yodle employees, have concocted a scheme to sabotage Yodle's business. This scheme includes relying upon unlawful means to steal Yodle's proprietary information and to use that information to inflict irreparable harm on Yodle. Not only have Defendants breached their contractual obligations, but they have unlawfully converted Yodle's property and misappropriated its trade secrets in violation of Pennsylvania's Uniform Trade Secrets Act, 12 Pa. C.S. §§ 5301, *et seq.* In order to prevent any further irreparable harm to Yodle, and for the reasons set forth above, Yodle respectfully requests that this Court enter the attached Temporary Restraining Order and Preliminary Injunction, which grant Yodle such relief.

Respectfully submitted,

**YODLE, INC.**

By its attorneys,

*/s/ William J. Leahy*
William J. Leahy (PA #80340)
**LITTLER MENDELSON, P.C.**
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA 19102-1321
Tel: 267.402.3000
wleahy@littler.com

-and-

David C. Kurtz (*pro hac vice* admission pending)
Itia S. Roth (*pro hac vice* admission pending)
Joseph P. Calandrelli (*pro hac vice* admission pending)
**PRINCE LOBEL GLOVSKY & TYE LLP**
100 Cambridge Street
Suite 2200
Boston, Massachusetts 02114
Telephone: 617.456.8000
Fax: 617.456.8100
dkurtz@princelobel.com
iroth@princelobel.com
jcalandrelli@princelobel.com

Dated: December 15, 2009